This opinion is uncorrected and subject to revision before publication in the New York Reports.
-----------------------------------------------------------------

No. 67
Adam L. Walton,
          Appellant,
        v.
Strong Memorial Hospital, et al.,
          Respondents.

          Edward J. Markarian, for appellant.
          Barbara D. Goldberg, for respondents.
          Healthcare Association of New York State, Inc., amicus curiae.

READ, J.:

          We are "present[ed with] yet another variation among a myriad of medical protocols, devices and procedures" (LaBarbera v New York Eye & Ear Infirmary, 91 NY2d 207, 212 [1998]), and asked whether a fragment from a catheter that was placed in plaintiff Adam Walton's heart during surgery in 1986 is a foreign object for purposes of the discovery rule of CPLR 214-a. Considering the specific facts and circumstances alleged in this

- 1 -

case in light of our precedents, we conclude that the fragment
qualifies as a foreign object.

I.

Facts

On May 27, 1986, when plaintiff was three years old, he
underwent surgery to correct a congenital heart malformation.
The operation was performed at Strong Memorial Hospital in
Rochester, New York.  The operative note states that at the
beginning of the surgery, after the incision was made, a
"[p]olyvinyl catheter was placed within [plaintiff's] left atrium
for recording atrial pressure."  The note further relates that,
before plaintiff was released from the operating room to the
surgical intensive care unit,

> "[p]olyvinyl catheters were placed within
> [plaintiff's] left atrium and right atrium
> for recording atrial pressure.  Myocardial
> pacing wires were placed upon the right
> atrium and right ventricle for pacing as
> indicated.  Two pericardial drainage tubes
> were left[,] one anteriorly and one
> posteriorly.  Hemostasis [i.e., stoppage of
> bleeding] was secured[, and t]he incision was
> closed . . . ."

On May 30, 1986, the third day after surgery, while
plaintiff was still in the surgical intensive care unit, the
catheters, pacing wires and drainage tubes were taken out of his
body; the nursing progress notes state as follows: "OF NOTE: LA
[i.e., left atrial] line possibly broke off with a portion
remaining in pt [patient], as it was being removed."  Plaintiff
was discharged from the hospital on June 7, 1986.

Fifteen years later, in April 2001, a pacemaker was inserted into plaintiff's heart; then, a year after that, in May, 2002, he underwent surgery to replace a damaged heart valve with a porcine (pig) valve.  The following year, on March 2, 2003, plaintiff suffered an embolic stroke; an echocardiogram performed the next day detected "small mobile filamentous masses" in plaintiff's heart, which were identified as possibly suture material, although clots could not be ruled out.  Five and a half years later, on December 2, 2008, plaintiff, by then 25 years old, suffered a transient ischemic attack, his second that year.  Accordingly, a decision was made to replace his pacemaker's battery, which was accomplished two days later.

The echocardiogram performed in conjunction with this last operation revealed "a regular-appearing left atrial foreign body."  As a result, on December 18, 2008, plaintiff underwent exploratory surgery, and plastic tubing was discovered in his heart.  The surgical pathology report states that the tissue submitted for analysis was labeled "left atrial line," and consisted of "a 10.2 cm in length x 0.1 cm in diameter brown catheter.[1]  Also received is a 2.0 x 0.1 cm tan catheter.[2]  At one of the catheter[s] is tan-white soft tissue adhered to the catheter."  The pathologist's diagnosis was "foreign body, heart,

_____

[1]Ten centimeters is slightly less than four inches.

[2]Two centimeters is slightly more than three-quarters of an inch.

excision: catheter; benign associated fibrous issue with focal calcification."

By summons and complaint dated November 24, 2009, plaintiff commenced this action against defendants Strong Memorial Hospital, University of Rochester Medical Center, Children's Hospital at Strong and five named physicians (collectively, defendants).  He alleged that, while treating him from May 26 to June 7, 1986, defendants negligently left a foreign body in his heart, which caused him to "suffer[] serious and permanent injuries," and that he "could not have reasonably discovered the presence of [this] foreign body prior to December 4, 2008."  In particular, plaintiff claimed that defendants negligently left a portion of an atrial catheter in the left and/or right atrium of his heart, which caused him to suffer a stroke and transient ischemic attacks, among other serious maladies.

By answers dated February 2, 2010, defendants asserted the statute of limitations as an affirmative defense, and by notice of motion dated March 14, 2012, they moved pursuant to CPLR 3211 (a) (5) to dismiss the complaint as time-barred. Defendants contended that this action should have been commenced by May 30, 1996, or 10 years after they had allegedly failed to remove the entire catheter, citing CPLR 208 (imposing a 10-year cap on the commencement of an infant's medical malpractice action).  Further, defendants contended, the foreign object

exception for medical malpractice actions did not apply.  This
exception, codified in CPLR 214-a, provides that although a
medical malpractice lawsuit must normally be brought within two
years and six months of

> "the act, omission or failure complained
> of[,] . . . where the action is based upon
> the discovery of a foreign object in the body
> of the patient, [it] may be commenced within
> one year of the date of such discovery or of
> the date of discovery of facts which would
> reasonably lead to such discovery, whichever
> is earlier. . . .  For the purpose of this
> section, the term 'foreign object' shall not
> include a chemical compound, fixation device
> or prosthetic aid or device."

Although plaintiff sued within one year of discovery of the
tubing, defendants took the position that the catheter was
necessarily a fixation device, not a foreign object, because
"[it] was intentionally placed inside the plaintiff during the
operation and served a continuing medical purpose beyond the
procedure itself."

In opposition to the motion, plaintiff submitted the
affidavit of a physician specializing in internal medicine and
cardiovascular disease, who opined that the catheters were
"placed to permit monitoring of arterial and venous pressures for
management of fluid replacement, blood pressure, and prevention
and/or treatment of congestive heart failure"; and "[had] no
treatment function, but rather, simply serve[d] as a conduit for
information from the cardiovascular system to a machine situated
outside the body that is capable of analyzing that information

and displaying the results on a monitor."  Accordingly,
plaintiff's expert concluded, the catheters were not "'fixative
device[s],' as that term is used in medicine," because they did
not "secure body tissues one to another, or at least provide
support to some structure within the body on either a permanent
or temporary basis."

Supreme Court granted defendants' motion, and dismissed
plaintiff's claims with prejudice (37 Misc 3d 539 [Sup Ct, Erie
County 2012]).  The judge rejected defendants' "fundamental
argument" that "an object, irrespective of its nature or purpose,
is always a 'fixation device' so long as it was intended to serve
some continuing treatment purpose after the procedure in which it
was placed in the body has concluded" (id. at 547-548).  Supreme
Court explained that

> "[t]he catheter here does not fit the concept
> of a 'fixation device' under any commonly
> understood meaning or technical sense.  It
> served no fixative or fixation purpose.  Its
> nature is not one which closes or fixates
> anything within a patient's body.  The
> affidavit from plaintiff's expert further
> confirms the futility of attempting to
> characterize this catheter as a 'fixation
> device'" (id. at 548).

The judge then considered whether the catheter,
although not excluded as a fixation device, was a foreign object.
Based on our decision in LaBarbera, he felt "compelled to
conclude that the catheter . . . [was] not a 'foreign object'
because, in the first instance, it was left in the plaintiff's
body deliberately with a continuing medical purpose" (id. at

549).

The Appellate Division agreed the complaint was untimely and so unanimously affirmed, but employed slightly different reasoning (114 AD3d 1289, 1290 [4th Dept 2014]). The court concluded that, in light of our decisions in Rockefeller v Moront (81 NY2d 560 [1993]) and LaBarbera, the catheter, which was deliberately inserted into plaintiff's heart to monitor atrial pressure, was a fixation device within the meaning of the statute. We granted plaintiff leave to appeal (23 NY3d 903 [2014]), and now reverse.

## II.

### Background

#### Flanagan

In Flanagan v Mount Eden Gen. Hosp. (24 NY2d 427 [1969]), the doctor inserted surgical clamps in the body of plaintiff Josephine Flanagan (Flanagan) during the course of gall bladder surgery in 1958. Eight years later, in 1966, after experiencing severe abdominal pain, Flanagan consulted another physician, who discovered by X-ray analysis that the clamps remained in her body. They were surgically removed, and shortly thereafter, Flanagan brought a medical malpractice action against the hospital and the estate of the doctor who had operated on her.

The defendants moved to dismiss the complaint as untimely, Supreme Court granted the motion and the Appellate

Division affirmed (29 AD2d 920 [1st Dept 1968]).  Deviating from our reluctance to create common law exceptions to a statute of limitations (see Schwartz v Heyden Newport Chem. Corp., 12 NY2d 212 [1963] [the plaintiff's cause of action accrued when the harmful chemical was injected into his body, not when its deleterious effects were discovered 15 years later], cert denied 374 US 808 [1963]; Conklin v Draper 229 App Div 227 [1st Dept 1930] [the statute of limitations began to run when arterial forceps were left in the plaintiff's abdomen during surgery, not when the malpractice was discovered more than two years afterwards], affd 254 NY 620 [1930]), we reversed.  We held that "where a foreign object has negligently been left in the patient's body, the Statute of Limitations will not begin to run until the patient could have reasonably discovered the malpractice" (Flanagan, 24 NY2d at 431).

We commented that at the time Conklin was decided, "no other jurisdiction had a contrary rule" (id. at 430), and reasoned that cases like Schwartz, which involved negligent medical treatment and medication, were fundamentally different from those where a foreign object is left in a patient's body; specifically, "[i]n the latter[,] no claim can be made that the patient's action may be feigned or frivolous . . . [and] there is no possible causal break between the negligence of the doctor or hospital and the patient's injury" (id.).  Further, this species of alleged malpractice "does not raise questions as to

credibility . . . [or] rest on professional diagnostic judgment or discretion"; and a foreign object like a clamp "retains its identity so that a defendant's ability to defend a 'stale' claim is not unduly impaired" (id. at 431).

### Lower Court Decisions After Flanagan

Subsequent to our decision in Flanagan, plaintiffs quite naturally pushed for expansion of this new precedent, and a number of courts obliged.  For example, in Dobbins v Clifford (39 AD2d 1 [4th Dept 1972]), the Appellate Division applied a discovery rule in an action involving an operation performed in 1966 to remove the plaintiff's spleen, which resulted in damage to his pancreas not apparent until 1970.  Although this fact pattern did not involve a foreign object by any stretch of the imagination, the court determined that "the rationale in Flanagan" (id. at 3 [emphasis added]) called for the statute of limitations to run from the plaintiff's discovery of the cause of his injuries rather than the date of the alleged malpractice because

> "the same fundamental factors are present . . . [; namely,] an act of malpractice committed internally so that discovery is difficult; real evidence of the malpractice in the form of the hospital record . . . available at the time of suit; professional diagnostic judgment is not involved[;] and there is no danger of false claims (id. at 3-4; see William Samore & Robert J. Tymann, 1972 Survey of New York Law, *Torts*, 24 Syracuse L Rev 551, 560 [1973] [noting that "(t)he importance of (Dobbins) lies in its expansive extension of prior case law.  It is obvious that the 'foreign object' category was not

originally intended to include damaged
organs"]).

Similarly, in an earlier case, Murphy v St. Charles
Hosp. (35 AD2d 64 [2d Dept 1970]), the Appellate Division applied
Flanagan to save an otherwise time-barred action involving a
prosthesis surgically inserted into the plaintiff's hip and femur
in 1963.  The prosthesis broke in 1967, forcing the plaintiff to
undergo surgery for removal of the fragmented and displaced
appliance.  The court concluded that the foreign object in
Flanagan was "akin to the prosthesis [in Murphy] . . . since both
involve the surgical insertion of a medical device . . . [and]
there is the same minimization of prejudice to a defendant in the
preparation of his case because of the availability and
identifiability of the real evidence involved" (id. at 67; but
see Schiffman v Hospital for Joint Diseases, 36 AD2d 31 [2d Dept
1971] [declining to extend Flanagan or apply Murphy to a case
where the plaintiff alleged the misreading of biopsy slides], lv
denied 29 NY2d 483 [1971]).  Additionally, Flanagan was extended
by a court to a case where the plaintiff sought damages allegedly
caused by exposure to a defective isotope (see Le Vine v
Isoserve, Inc., 70 Misc 2d 747 [Sup Ct, Albany County 1972]; but
see Fonda v Paulsen, 79 Misc 2d 936, 939, 940 [Sup Ct, Albany
County 1974] [declining to adopt the "plaintiffs' interesting and
novel theory that negligently undetected cancer (was) a 'foreign
body' within the purview of Flanagan" because "(t)he Court of
Appeals specifically . . . failed to adopt a broad discovery test

. . . for all malpractice cases regardless of whether a foreign

object (was) involved"], revd on other grounds 46 AD2d 540 [3d

Dept 1975]).

The Adoption of CPLR 214-a

In 1975, Governor Hugh L. Carey proposed and the

Legislature enacted CPLR 214-a, one of a number of reforms aimed

at making medical malpractice insurance more affordable in New

York State (see generally L 1975, ch 109).  CPLR 214-a, in

combination with an amendment to CPLR 214 (6), reduced the

statute of limitations for medical malpractice actions from three

years to two years and six months, and also continued, but sought

to curtail, Flanagan's discovery rule for foreign objects.[3]  In

his Program Bill Memorandum, the Governor explained that although

> "the Court of Appeals sought to make it
> emphatically clear that its decision [in
> Flanagan] should be limited to foreign
> objects and should not become a 'discovery'
> rule . . . , 'intermediate appellate courts
> rapidly sought to broaden it into a
> 'discovery rule.'  For example, they applied
> [Flanagan] to instances where fixation
> devices were inserted in a patient's body for
> the purpose of treatment and to chemicals
> introduced in the body for the purpose of
> treatment.  The most damaging expansion was
> to a situation where nothing was introduced

---

[3]CPLR 214-a also continued the "continuous treatment"
doctrine that we embraced in Borgia v City of New York (12 NY2d
151 [1962]), but sought to prevent manipulation of the date when
the statute of limitations began to run; specifically, section
214-a provides that "[f]or the purpose of this section the term
'continuous treatment' shall not include examinations undertaken
at the request of the patient for the sole purpose of
ascertaining the state of the patient's condition."

into the patient's body but malpractice
occurred in that while treating one organ the
doctor caused damage to another.[4]  It is
obvious that this latter extension has a
potential of bringing virtually all medical
malpractice cases under the discovery rule.
This measure would correct these abuses by
limiting the discovery statute to 'foreign
objects' and specifically excluding therefrom
chemical compounds, fixation devices and
prosthetic devices" (Governor's Program Bill
Mem, Bill Jacket, L 1975, ch 109 at 4).[5]

CPLR 214-a took effect on July 1, 1975.  We first

discussed the new statute in Matter of Beary v City of Rye (44

NY2d 398 [1978]), which consolidated for appeal five separate

tort claims.  There, we reversed Matter of Smalls v New York City

Health & Hosps. Corp. (55 AD2d 537 [1st Dept 1976] [lesion caused

by a cervical myelogram allegedly negligently performed in 1973])

and Merced v New York City Health & Hosps. Corp. (56 AD2d 553

[1st Dept 1977] [allegedly negligent failure to suture a

fallopian tube during a sterilization operation in 1971]).  In

both cases, the Appellate Division had determined, with two

Justices dissenting, that the plaintiffs' notices of claim were

timely filed by extrapolating from Flanagan's rationale to

_____

[4]The Governor's Program Bill Memorandum is obviously
referring to Dobbins here, and CPLR 214-a's exclusion of
"prosthetic aid[s] and device[s]" is presumably intended to
abrogate Murphy.  Appellate cases that were decided before 1975
and extended Flanagan to create a discovery rule for fixation
devices and chemical compounds are not so easy to identify.

[5]The Governor's proposed bill also included a six-year
outside limit to an exception from the basic statute of
limitations for medical malpractice lawsuits.  The Legislature
did not endorse this approach.

justify a discovery rule.  With reference to the plaintiff in

Merced, we observed that although she

> "advance[d] the argument . . . that
> considerations similar to those which
> motivated the [C]ourt in Flanagan should be
> applied with like effect to the far different
> circumstances in her case . . . [,] the
> enactment of CPLR 214-a . . . clearly
> interdicted the extension of the 'foreign
> object' exception . . . .  By expressly
> prohibiting the inclusion of chemical
> compounds, fixation devices and prosthetic
> aids from the embrace of the term 'foreign
> object' and by limiting the time within which
> an action based on the presence of such an
> object in the body of a patient may be
> commenced to one year from the date of its
> discovery, the Legislature left us no room
> but to conclude that it intended that
> Flanagan not be broadened beyond its existing
> confines" (44 NY2d at 414-415 [emphases
> added]; see also Thornton v Roosevelt Hosp.,
> 47 NY2d 780 [1979] [refusing to extend
> Flanagan to a strict products liability
> claim]; Goldsmith v Howmedica, Inc., 67 NY2d
> 120, 123 [1986] [holding that the general
> time-of-commission accrual rule applies in a
> medical malpractice action brought against a
> physician who implanted a prosthetic device
> that malfunctioned eight years after
> surgery]).

            The IUD Cases in the Lower Courts and Rodriguez

        Subsequent to CPLR 214-a's enactment, a number of cases

arose addressing whether intrauterine devices (IUDs) were foreign

bodies.  IUDs are plastic or metal objects that are inserted into

a woman's uterus to prevent pregnancy, and the placement of an

IUD is a nonsurgical intervention.  In the most common fact

pattern resulting in litigation, a doctor inserted an IUD into a

plaintiff's womb without detecting and removing a previously

placed IUD.  In the earliest of the reported cases, Supreme Court
agreed with the defendant that an IUD was a fixation device
because it was "fixed within the woman's body," but held that
"when the second IUD was placed in the plaintiff's body the first
IUD became, or took on the character of a 'foreign object'
because it then had no function to perform, no longer belonged in
the body and should have been removed as expected by the patient"
(Darragh v County of Nassau, 91 Misc 2d 53, 54-55 [Sup Ct, Nassau
County 1977], affd 63 AD2d 1010 [2d Dept 1978]; see also Ooft v
City of New York (80 AD2d 888 [2d Dept 1981] [same]; Sternberg v
Gardstein, 120 AD2d 93 [2d Dept 1986] [an IUD became a foreign
object when not removed, as intended and agreed upon, during an
operation involving an abortion and tubal ligation
sterilization]; cf. Szakalski v Aubry (148 AD2d 972 [4th Dept
1989] [holding that an IUD contained within a surgically removed
pelvic mass was a fixation device, and not reaching the
plaintiff's argument that the IUD was "transformed" from a
fixation device into a foreign object when she was erroneously
advised that the IUD had probably been expelled]).

        The issue finally reached us in Rodriguez v Manhattan
Med. Group (77 NY2d 217 [1990]).  Plaintiff Evelyn Rodriguez
(Rodriguez) had an IUD inserted in her uterus in 1980; two years
later, when she and her husband decided to start a family, she
visited a doctor to have the IUD removed.  The doctor examined
Rodriguez and could not locate the IUD; he then ordered X-rays of

Rodriguez's lower abdomen, which did not show the IUD.  He

therefore advised Rodriguez that she could attempt to conceive

without any medical intervention.  By the spring of 1986,

Rodriguez, who had not become pregnant in the meantime, was

experiencing heavy vaginal bleeding, leading her to consult

another doctor.  This physician ordered a sonogram, which

revealed that the IUD inserted in 1980 was embedded in the

vaginal wall.  The IUD had to be removed surgically.

Rodriguez and her husband then sued the doctor who

examined her in 1982 and his employer, claiming that the doctor

had acted negligently in failing to locate the IUD.  The

defendants interposed the statute of limitations as an

affirmative defense, and the plaintiffs responded that the

limitations period did not begin to run until the IUD's discovery

in Rodriguez's body in 1986.  Holding that the IUD was a fixation

device and therefore not a foreign object within the meaning of

section 214-a, Supreme Court dismissed the complaint, and the

Appellate Division, with two Justices dissenting, affirmed (155

AD2d 114 [1st Dept 1990]).

The plaintiffs took the position that although the IUD

was a fixation device when originally implanted in Rodriguez's

body, the IUD became a foreign object once the doctor left it in

place after Rodriguez specifically directed him to remove it.[6]

---

[6]Because of the way the plaintiffs argued Rodriguez, we had
no occasion to discuss whether or why an IUD is a fixation device
within the meaning of CPLR 214-a.

We disagreed with the "notion of a transformation in a 'fixation device's' character resulting from a physician's postinsertion negligence[, which was] evidently derived from a legal theory pertaining to undetected and unremoved IUDs" popular in some lower courts (id. [citing Sternberg, Ooft and Darragh, among other cases and commentary]).

Summing up, we observed that the plaintiffs' theory was "flawed" because it disregarded Flanagan's "context"; specifically, in Flanagan,

> "the patient was suing the practitioners who had actually left the surgical clamps in her body and the focus of her claim was that very act. Here, . . . there is no claim against the physician who actually inserted the IUD; instead, [the] plaintiffs are seeking recovery from a different treating physician on the theory that his treatment of [Rodriguez] in connection with the previously inserted IUD was negligent. . . . Indeed, the gist of [the] plaintiffs' claim, i.e., a negligent failure to detect the continued presence of a previously inserted device, is most logically classified as one involving misdiagnosis -- a category for which the benefits of the 'foreign object' discovery rule have routinely been denied" (id. at 222-223 [internal citation omitted]).

Finally, we noted that the "special analytical factors . . . deemed significant in Flanagan" cut against a discovery rule and that, in any event, the Legislature's adoption of CPLR 214-a "preclude[d] our adoption of a more flexible discovery rule for these (IUD) cases even if considerations similar to those which motivated the [C]ourt in Flanagan [c]ould be applied with like effect" (id. at 223-224 [internal quotation marks omitted]).

Rockefeller

        We next grappled with the foreign object exception in
Rockefeller, where a suture was affixed to an organ (the vas
deferens) not properly involved in the hernia repair surgery that
plaintiff Mark Rockefeller (Rockefeller) underwent in 1971 as a
four-year-old child.  The error was discovered in 1989, when
Rockefeller and his wife sought to discover if there was a
medical reason why she was unable to become pregnant.  After an
attempt to repair the damage to the vas deferens proved
unsuccessful, Rockefeller and his wife brought an action for
medical malpractice against the doctor responsible for the suture
and the hospital where he performed the hernia operation.
Supreme Court rejected the defendants' motions to dismiss on
statute-of-limitations grounds, holding that the suture was a
foreign object; the Appellate Division, with two Justices
dissenting, agreed (182 AD2d 160 [3d Dept 1992]).  The defendants
appealed.

        Because the alleged malpractice occurred before CPLR
214-a took effect, the timeliness of Rockefeller's lawsuit was
governed by the three-year limitations period in former CPLR 214
(6) and decisions interpreting the foreign object exception as
articulated in Flanagan.  Additionally, because Rockefeller was
an infant when the alleged malpractice occurred, he was entitled
to the benefit of the infancy toll in CPLR 208 as it existed
prior to July 1, 1975.  Ultimately, though, the timeliness of his

action turned entirely on whether the suture was a foreign object

(see Rockefeller, 81 NY2d at 564 n 2).[7]

We observed that when deciding whether an item of

medical paraphernalia is a foreign object,

> "the courts should consider the nature of the
> materials implanted in a patient, as well as
> their intended function.  Objects such as
> surgical clamps, scalpels, and sponges are
> introduced into the patient's body to serve a
> temporary medical function for the duration
> of the surgery, but are normally intended to
> be removed after the procedure's completion
> . . . .  By contrast, items which are placed
> in the patient with the intention that they
> will remain to serve some continuing
> treatment purpose constitute 'fixation
> devices'" (id. at 564).

In support of the proposition that the courts considered fixation

devices in general and sutures in particular to have been "exempt

from coverage under the judicially created 'foreign object' rule

---

[7]In a related context, we have held that the maximum 10-year
extension of the statute of limitations which CPLR 208, as
amended in 1975, imposes on infants in medical malpractice
actions runs from the initial negligent act, not from the end of
any period of subsequent continuous treatment (see Matter of
Daniel J. v New York City Health & Hosps. Corp., 77 NY2d 630
[1991]; see also McDermott v Torre, 56 NY2d 399 [1982]; David D.
Siegel, NY St L Dig No. 328 at 2 [June 1991]).  Here, defendants
asserted that, by virtue of CPLR 208, the statute of limitations
lapsed 10 years after the catheter fragment was allegedly left in
plaintiff's heart; however, they apparently never contended (and
surely did not argue on appeal to us) that plaintiff's claim was
untimely even if the catheter was a foreign object because the
discovery exception, instead of postponing accrual, merely tolled
the statute of limitations.  Accordingly, we have no occasion to
consider and express no opinion about the interplay of CPLR 208
and CPLR 214-a in a case involving a foreign object left in an
infant after surgery and discovered more than 10 years later.

prior to enactment of CPLR 214-a" (id.), we cited Lombardi v
DeLuca (71 NY2d 838 [1988], affg 130 AD2d 632 [2d Dept 1987] ["A
fixation device, in this case, suture material, intentionally
placed in the body and not left there in the course of some later
procedure in which it should have been removed, does not
constitute a 'foreign object'"]).  Lombardi addressed sutures
placed in plaintiff Mildred Lombardi's abdomen during an
operation performed in 1966, remnants of which were discovered
during exploratory surgery in October 1975.

> Analogizing to Rodriguez, we concluded that

> "a claim based on a medical professional's
> deliberate implantation of a 'fixation
> device' [here, sutures] in the wrong place
> does not transform it into a foreign object.
> Such a claim is more readily characterized as
> one predicated on negligent medical
> treatment, which, like misdiagnosis, is a
> category of malpractice not covered by the
> 'foreign object' rule" (81 NY2d at 565).

Stated slightly differently, Rockefeller's claim was "more
accurately characterized as a challenge to [the doctor's] medical
judgment and treatment -- i.e., his placement of the suture --
and not as one predicated on [his] failure to remove medical
material that should have been extracted at the close of the
operation" (id. at 566).  Obviously (if obliquely) referring to
the legislative purpose animating CPLR 214-a, we reiterated the
importance of restricting the foreign object exception to "the
narrow confines announced in Flanagan," and pointed out that
"only in circumstances where a foreign object is negligently

'left' in the patient's body without any intended continuing treatment purpose will the discovery rule be available to delay the running of the Statute of Limitations" (id.)

### LaBarbera

In May 1986, plaintiff Peter LaBarbera (LaBarbera) underwent a procedure described in the operative record as "total nasal reconstruction with placement of silastic stents."  During the surgery, the doctor placed a 2 cm x 6 cm silastic stent, described as a device made of biologically inert, implantable material, in LaBarbera's left nasal cavity and sutured the stent in place; he then packed the area with gauze.  Within two weeks following surgery, the doctor removed the gauze, but left the stent.  In the ensuing months, LaBarbera suffered from dizziness and voiced persistent nasal and respiratory complaints.  He claimed that the doctor who performed the nasal reconstruction had misdiagnosed the cause of these ailments and erroneously treated him for allergies.  In October 1992, LaBarbera alleged, the stent was discovered and determined to be the cause of his symptoms; it was surgically removed the next month.

LaBarbera brought suit against the doctor who had implanted the stent and the hospital where the operation had been performed.  His expert opined that the stent should have been removed about 10 days after surgery, when it "no longer

function[ed] to maintain a bodily structure."[8]  Both parties'

experts agreed that the stent was a fixation device because it

had been intentionally placed in LaBarbera's nose "to provide

support for the internal structures of the nose that were the

subject of the operation and to prevent scarring" (the defendant

doctor's expert); and/or as "a part of the medical procedure . .

. used to maintain a bodily structure" (LaBarbera's expert).

Supreme Court dismissed the action as untimely,

concluding that the nasal stent was a fixation device; the

Appellate Division, with one Justice dissenting, agreed (230 AD2d

303 [1st Dept 1997]).  The dissenting Justice considered the

stent to be a foreign object "based on a physician's failure to

make certain that all temporary holding devices -- clamps,

temporary stents, and others -- have been removed from the body

at the close of a single -- albeit several-stage -- medical

proceeding" (id. at 311 [Murphy, P.J., dissenting]).

We characterized the issue presented by LaBarbera's

appeal as "whether a plastic stent, placed in [LaBarbera's] nose

for postsurgery healing purposes, constitutes a 'foreign object'

---

[8]In his answer to the complaint, the defendant doctor denied LaBarbera's allegation that the "the foreign body [i.e., the implanted silastic stent] should have been removed within several days after the procedure."  Moreover, the defendant doctor's expert said nothing about whether or under what circumstances the sutured-in stent should have been taken out of LaBarbera's nose. He stated simply that "[i]t is intended that the stent remain in the patient's nose after surgery is completed to serve a continuing treatment purpose."

that would avoid the bar of the statute of repose" (91 NY2d at 208).  We concluded that the stent was not a foreign object based on "the same dispositional criterion used in Rockefeller -- intentional insertion of a therapeutic item for postsurgery continuing treatment purposes," whereas a foreign object is "'negligently "left" in the patient's body without any intended continuing treatment purpose'" (id. at 212, quoting Rockefeller, 81 NY2d at 566, citing McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C214-a:3 at 603 ["(i)t has become relatively clear that a foreign object is one that the doctor does not intend to leave inside the body"]).  Here, we concluded, the stent was not "'left'" in LaBarbera's nose; "[r]ather, it was put there only to be removed after it had served its postsurgery healing purposes. . . . [T]he key feature is the uncontroverted protocol of insertion as part of a continuing treatment modality" (id. at 212-213 [emphasis added]).  Accordingly, we disagreed with both LaBarbera's theory that "the relatively short and ordinarily definite nature of the stent's time in the nose should allow it to be treated as a 'foreign object,'" and the "'multistage procedure' exception (i.e., that the surgical procedure continued until the packing was removed)" advanced by the dissenting Justice of the Appellate Division (id. at 213).

IV.

Analysis

Several general principles may be distilled from our cases considering the foreign object exception: (1) tangible items (clamps, scalpels, sponges, etc.) introduced into a patient's body solely to carry out or facilitate a surgical procedure are foreign objects if left behind (Flanagan and dicta in Rockefeller and LaBarbera); (2) the alleged failure to timely remove a fixation device does not transform it into a foreign object (Rodriguez and LaBarbera); (3) nor does a fixation device become a foreign object if inserted in the wrong place in the body (Rockefeller); (4) failure to timely remove a fixation device is generally akin to misdiagnosis (Rodriguez), and improper placement of a fixation device is most readily characterized as negligent medical treatment (Rockefeller); and (5) the Legislature, in enacting CPLR 214-a, directed the courts not to exploit the rationale supporting Flanagan to expand the discovery exception for foreign objects beyond the rare Flanagan fact pattern, and explicitly commanded that chemical compounds, fixation devices and prosthetic aids or devices are never to be classified as foreign objects (Beary [Merced], Rodriguez, Rockefeller, LaBarbera and the legislative history of CPLR 214-a).

As discussed, most of our post-Flanagan cases have dealt with ultimately unsuccessful attempts by plaintiffs to circumvent the exclusion of conceded or obvious fixation devices from the foreign object exception/tolling provision of CPLR 214-

a.  Not surprisingly, then, defendants in this case advocate a very expansive definition of a fixation device, intended to sweep in the catheter placed in the left atrium of plaintiff's heart during surgery and allegedly incompletely removed three days later while he was being cared for in the surgical intensive care unit.  Specifically, defendants interpret Rockefeller and LaBarbera to hold that "any device that is intentionally left in a patient's body for purposes of continuing treatment is a 'fixation device,' and not a 'foreign object,' [because t]he appropriate focus should not be on the specific function that a device was intended to perform, but whether the device was intentionally inserted as part of a continuing treatment modality."

We specifically stated in Rockefeller, though, that "[i]n determining whether an object which remains in the patient constitutes a 'foreign object,' courts should consider the nature of the materials implanted in a patient, as well as their intended function" (81 NY2d at 564 [emphasis added]).  The suture in Rockefeller and the nasal stent in LaBarbera were undeniably fixation devices -- the suture performed a securing function and the stent, a supporting function.  Because the suture and the stent were fixation devices, they were intentionally placed for a continuing treatment purpose.  In short, every fixation device is intentionally placed for a continuing (even if temporary) treatment purpose, but it does not follow that everything that is

intentionally placed for a continuing treatment purpose is a fixation device.  Otherwise, there would have been no reason for the Legislature to separately identify and exclude prosthetic aids or devices from the ambit of the foreign object exception, because prosthetic aids or devices are also intentionally placed to serve a continuing medical purpose.  Defendants' overly-broad proposed definition of a fixation device divorces statements in Rockefeller and LaBarbera from their context.

Here, the catheter inserted in the left atrium of plaintiff's heart performed no securing or supporting role during or after surgery.  As explained by plaintiff's expert, and uncontroverted by defendants, the catheters functioned like a sentinel, allowing medical personnel to monitor atrial pressure so that they might take corrective measures as required; the catheters were, in the words of plaintiff's expert, "a conduit for information from [plaintiff's] cardiovascular system."  Because the catheters under the facts of this case are therefore not fixation devices (or chemical compounds or prosthetic aids or devices), they are not categorically excluded from the foreign object exception in CPLR 214-a.

The question then becomes whether the catheters are analogous to tangible items like the clamps in Flanagan or other surgical paraphernalia (e.g., scalpels, sponges, drains) likewise introduced into a patient's body solely to carry out or facilitate a surgical procedure.  We conclude that they are,

although we recognize that factual differences exist between this case and Flanagan.

First, the clamps in Flanagan were inadvertently left behind at the conclusion of the surgery, before the plaintiff left the operating room.  Here, a catheter fragment was allegedly allowed to remain in plaintiff's heart when medical personnel removed the catheters, drainage tubes and pacing wires, which were placed in plaintiff's body during surgery.  This occurred three days following surgery while plaintiff was being cared for in the hospital's surgical intensive care unit.  Second, the doctor in Flanagan apparently forgot to retrieve the clamps before closing the patient's incision.  In this case, by contrast, the catheter was not forgotten; instead, its removal was allegedly botched.  Thus, medical personnel did not intend in the first instance to leave any tubing in plaintiff's heart, although it is presumably possible (there is no way to tell from the nursing progress notes) that a judgment was made that any catheter fragment left behind was too inconsequential to present a significant risk, or that plaintiff's condition was too fragile to tolerate exploratory or retrieval efforts, at least at that juncture.

These particular variations on the Flanagan fact pattern do not, in our view, make this case meaningfully different or expand the foreign object exception beyond its legislatively-limited scope.  Like the clamps in Flanagan, the

catheter was introduced into plaintiff's body during an operation for an instrumental purpose.  Unlike the clamps, the catheter remained in plaintiff's body for a few days after surgery, but not for "postsurgery healing purposes" as was the case with the nasal stent in LaBarbera (91 NY2d at 212).  Instead, the catheter served a monitoring function.  Leaving the catheter in plaintiff's body post-surgery did not convert a surgical device into a fixation device any more than leaving the IUD in Evelyn Rodriguez's body converted a fixation device into a foreign body. The "nature of the materials" and their "intended function" remained constant in both cases (Rockefeller, 81 NY2d at 564). And the fragment, of course, served no purpose whatsoever; it certainly was not a fixation device, however defined. Fundamentally, if the facts are as alleged, plaintiff -- like Josephine Flanagan -- left the hospital after an operation with therapeutically useless and potentially dangerous surgical paraphernalia lodged in his body.

Accordingly, the order of the Appellate Division should be reversed, with costs, and defendants' motion to dismiss the complaint as time-barred denied.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed, with costs, and respondents' motion to dismiss the complaint as time-barred denied.  Opinion by Judge Read. Chief Judge Lippman and Judges Pigott, Rivera, Abdus-Salaam, Stein and Fahey concur.

Decided June 10, 2015